IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2011

**BRUCE S. RISHTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County**
**No. C53,320     Robert H. Montgomery, Jr., Judge**

**No. E2010-02050-CCA-R3-PC - Filed May 21, 2012**

The petitioner, Bruce S. Rishton, appeals the denial of his petition for post-conviction relief from his attempted rape and incest convictions, arguing that (1) he was constructively denied counsel at a critical stage of the proceedings against him; (2) he received the ineffective assistance of counsel, which caused him to enter unknowing and involuntary pleas; (3) the State engaged in prosecutorial misconduct; (4) the post-conviction court denied him a full and fair hearing; and (5) the trial court denied him a speedy trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Bruce S. Rishton, Pikeville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Authorities arrested the petitioner, Bruce S. Rishton, on August 29, 2005, and charged him in case number S51,181 with the rape of his sister-in-law, T.C., and, in case number S51,180, with the rape of his adopted daughter, H.R., who was a minor at the time. The general sessions court appointed the district public defender to represent the petitioner after his arrest. The petitioner waived a preliminary hearing on September 6, 2005, and the

charges were bound over to the criminal court. In October 2005, the criminal court judge appointed the public defender to represent the petitioner in criminal court. The public defender's office filed a motion, on November 17, 2005, to reduce bond on behalf of the petitioner. The State filed a counter motion to revoke the petitioner's bond. The trial court heard the motions on December 8, 2005, and increased the petitioner's bond.

On April 4, 2006, the court arraigned the petitioner in case number S51,181 after the grand jury returned a true bill of indictment on March 15, 2006. The trial court set the petitioner's trial date for June 22, 2006; however, the court subsequently removed it from the trial docket. On July 21, 2006, the court arraigned the petitioner in case number S51,180 after the grand jury returned a presentment on July 19, 2006. On July 25, 2006, the trial court removed the district public defender as counsel for the petitioner after the petitioner claimed that the public defender had failed to communicate with him. The trial court appointed private counsel to represent the petitioner.

On November 6, 2006, the petitioner entered "best interest" guilty pleas in case number S51,181 to one count of attempted rape, a Class C felony, and in case number S51,180 to five counts of incest and five counts of attempted rape, Class C felonies. The prosecutor recited the following factual basis for the pleas at the guilty plea hearing:

If we had proceeded to trial in Case No. S51,181 the State would have the following evidence. On August 29, 2005 the victim, [T.C.], who is an adult individual and she is also the [petitioner's] sister-in-law, was staying with the [petitioner] and her sister, . . ., in Sullivan County, Tennessee. She had young children there with her . . . at the [petitioner's] residence. She would state that she woke up from a dead sleep with the [petitioner] lying either on her or beside her with her pants down digitally penetrating her vagina. [T.C.] would give a history of prior sexual assaults with this [petitioner], should it become relevant, reaching back into her minority when she lived with [her sister] and [the petitioner] and their children. She would state that she did not give her consent and was awakened to an offense already committed. She immediately told her sister. She immediately called the police. This was immediately turned over.

As to [Case No.] S51,180, the parties would stipulate that the offenses occurred on the dates as alleged in the indictments or presentments. The victim is [H.R.]. Her date of birth was August 28th, 1989. After [T.C.] came forward with her abuse within about a 24 hour period [H.R.] also told her mother that this had been also happening to her for some period of time. [H.R.] would go on to tell authorities that her abuse began in another

-2-

jurisdiction back in the year 2000 and continued until the August 29th date when [T.C.] came forward.

[H.R.] . . . gave details, although many more offenses occurred than the State has charged. The State took a diary and worked around significant dates in [H.R.'s] life to come up with the dates that we ultimately used. All of those events occurred either in the home in Sullivan County or in, by the lake in Sullivan County and the earlier abuse, as I stated, occurred not only in Washington County, Tennessee but in another [s]tate that has been referred to, other jurisdictions, and that we do not know what they will do in those cases.

[H.R.] was also able to tell us that during the events which would occur at her home on every occasion the [petitioner], who was her father, would have her watch pornographic movies. She described in detail to us some of those specific movies. The State, various pornographic . . . movies, in fact a whole box full of them, were recovered from the home and turned over to officers and on those tapes are the events or the scenes that [H.R.] would describe.

[H.R.] would state that she did not want to have sexual penetration and this would either be digital, oral or attempted penile penetration either on her or on him in each case; that . . . it began when she was a young child and continuing until the present day, . . . that she would not be able to go out, she would not be able to leave the house, she could not see her friends, she could not have a boyfriend or he would be mean to her family if she refused his sexual advances, that her life would have been, was made very difficult.

She did go to have a physical – the child is, although fully capable of testifying, is highly emotionally traumatized by the events and when we took her for the medical [examination] . . . the doctor, without putting her to sleep, could not conduct a full pelvic exam but what she was able to see was very suspicious and did show some tiny tearing of the hymenal ring. But she just could not go further than that without putting the child under to complete the exam.

The trial court sentenced the petitioner, as a Range II multiple offender, to ten years for each count. The court ordered that he serve each count in case number S151,180 concurrently with each other and concurrent with his sentence in case number S151, 181 for a total effective ten-year sentence.

On March 5, 2007, the petitioner filed a *pro se* petition for post-conviction relief alleging that (1) his conviction was based on the unconstitutional failure of the prosecution to disclose favorable evidence; (2) he received ineffective assistance of counsel; and (3) there was newly discovered evidence. The post-conviction court appointed post-conviction counsel who filed an amended petition on January 22, 2008. On February 25, 2008, post-conviction counsel filed a supplement to the amended post-conviction petition adding claims that the trial court violated the petitioner's right to a speedy trial and his right to due process.

At the petitioner's post-conviction evidentiary hearing, Detective Bobby Russell, of the Sullivan County Sheriff's Department, testified that the petitioner's arrest stemmed from allegations of sexual abuse reported to the Kingsport Justice Center by the victims. Detective Russell met with the victims, typed an affidavit, swore to the affidavit, and went to the petitioner's home to tell him about the charges. The petitioner invoked his right to counsel, which prevented Detective Russell from questioning the petitioner.

Detective Russell identified his notes of his August 29, 2005 interview with H.R. Detective Russell said that H.R. went to counseling and gave the sheriff's department a handwritten statement. Detective Russell said that his only interview with the petitioner's sister-in-law was the initial one. He did not audio or video record the interviews, nor did he take pictures of the victims. Detective Russell testified that Detective Karen Watkins took H.R. to a lake property where some abuse had occurred. The detectives did not take any tangible items for testing or request any DNA or fingerprint tests.

According to Detective Russell, a medical examination was performed on H.R. on September 6, 2005. He said that the examination was performed eight days after the petitioner's arrest because H.R. said that the petitioner had last raped her in July, and "[t]here was no rush at that point to have an exam done." Detective Russell received a copy of H.R.'s examination results on November 1, 2006. He said that he did not immediately look into the results of H.R.'s medical examination because his office had her statement and "often times a medical exam, even with full intercourse will not show anything, and it's not unusual for a child that's been victimized for the results to come back with not any sign." Detective Russell testified that no one had instructed him to forgo obtaining H.R.'s examination results and denied that the reason he did not immediately obtain the results was because of its "exculpatory nature."

Detective Russell could not explain why it had taken so long for the case to reach the grand jury for indictment. Detective Russell testified that he gave the information obtained during his investigation to the district attorney's office, and the district attorney's office decided when to submit the case to the grand jury. He assumed that the district attorney's office decided who testified at the grand jury hearing. Detective Russell was the only

witness to testify during the grand jury proceeding. He was unaware of why the victims were unable or unwilling to testify but said that it was common practice for the detective investigating the case to testify rather than the actual eyewitnesses.

Detective Russell stated that the dates of the incidents listed on the indictment were taken from a calendar that H.R. had kept. H.R. had marked the calendar and related the occurrences to certain dates and events. He could not remember how he had testified during the grand jury hearing and did not know how the grand jury came up with the August dates listed on the indictment.

On cross-examination, Detective Russell testified that in his experience, district attorneys often asked him for additional work after he sent them his prosecution file, and his investigation did not stop when he turned over a prosecution report. On November 15, 2005, the prosecutor in this case requested that Detective Russell conduct additional investigation, including obtaining H.R.'s medical report.

Detective Russell believed that the Department of Children's Services requested that H.R. undergo a physical examination. He stated that the usual procedure was for the Children's Advocacy Center (CAC) to perform an evaluation, make a report, and furnish that report to the district attorney's office and detectives. Detective Russell went to the CAC to see whether there was a report of H.R.'s physical examination, and there was not one.

Detective Russell said that the district attorney's office subsequently discovered that a private physician had performed a physical examination of H.R. in September 2005. When Detective Russell obtained the report, he gave it to the district attorney's office. Detective Russell said that his not obtaining the report earlier was an oversight and that he did not intentionally delay obtaining the report to prevent the defense from getting it.

Detective Russell said he had received training regarding the results and findings by physicians in sexual abuse cases. He stated that, in his experience, examiners find less as the child gets older and as the period of time between the abuse and the examination increases. He said that rape kits were not performed when an adult had been digitally penetrated.

Detective Russell testified that nothing suggested that the victims were uncooperative or would have been unavailable if he had asked them to testify. The petitioner had written letters to H.R. and her mother before the indictment, and Detective Russell said that they feared that the petitioner would be released and were hesitant to testify. Detective Russell met with the victims several times besides his interview session with them. He said that it was not unusual for new counts to be added to or for the counts to be changed after the original complaint was filed. Detective Russell stated that, in his experience, child sex abuse

cases take took longer to investigate because of the nature of the crimes and dealing with the victims.

Detective Russell said that he would not have falsely testified in front of the grand jury and did not in this case. He stated that if the grand jury returned a true bill that included allegations of abuse in August, it would have been because he testified that there was information and evidence to substantiate the charge. He said that the customary practice was for the counts to be read to him and then he would testify to the grand jury as to his findings on each count.

Detective Russell testified that is was not unusual to discover additional information about a case when talking to the victim or a counselor at the CAC. He further testified that child victims usually did not explain everything they knew. He stated that, when an investigator had to find specific locations and times of events, it prolonged the investigation. There was an issue in the investigation of this case about which offenses occurred in Sullivan County versus which happened in other jurisdictions, which required further investigation.

Detective Russell stated that sometimes before children testify they undergo counseling at the CAC to determine whether they omitted any additional information. The State directed Detective Russell to investigate whether there was any exculpatory information and whether the victims had accused any other people of rape. He said that the State instructed him to turn over any exculpatory information that he found, and he denied that the State directed him to hide evidence or purposely delay the prosecution of the petitioner.

Detective Russell said that H.R. alleged that she had watched pornographic videos with the petitioner. During the investigation, authorities found pornographic materials in the petitioner's home. The detectives investigating the case reviewed the videos to corroborate what H.R. had said about them. The detectives gave the videos to the district attorney's office for the State to review.

At the time of the petitioner's case, Detective Russell was the lead sex abuse investigator in Sullivan County. He handled several cases with assistance but said that he had the bulk of the case load. He denied purposely trying to delay the prosecution of the petitioner.

On redirect examination, Detective Russell testified that he did not ask the victims whether they had a physical examination. H.R. was sixteen years old when she reported the abuse. Detective Russell said that in his experience sixteen year olds could have a problem recalling exact dates. Detective Russell agreed that it would not have taken more than a day to go to the lake property where some alleged abuse had occurred. He stated that he watched

the pornographic videos taken from the petitioner's home but could not remember how long it had taken him to watch them. Detective Russell agreed, however, that it would have taken him less than a week to watch them.

Trial counsel testified that the court appointed him to represent the petitioner on July 26, 2006. He filed his first motion for discovery in this case on August 15, 2006, and filed additional motions later. The first time he met with the petitioner was August 17, 2006. Trial counsel reviewed the public defender's file for the petitioner's case and spoke with the public defender who had previously handled the petitioner's case. Trial counsel also reviewed the State's discovery. Trial counsel stated that the State had an open file policy and its discovery file contained photographs, affidavits, and copies of a videotape. He did not recall seeing H.R.'s diary or a copy of it in the discovery file.

Trial counsel said that the discovery packet did not include a medical report for either of the victims. The motion for discovery that trial counsel filed requested that the State turn over any reports from physical or mental evaluation. Trial counsel stated that, in its response, the State replied that it did know any such discovery materials to exist. He further stated that not having a medical examination was odd considering the length of time between the arrest and the indictment. He did not recall asking why a doctor had not performed a medial examination earlier.

Trial counsel wanted to hire an investigator to investigate the statement of the victims and the State's witnesses. Trial counsel prepared a motion for an investigator and was prepared to file it. However, after speaking with the petitioner and the petitioner's family, he did not file the motion because the petitioner's family was going to hire a specific private investigator. He said that he and the petitioner discussed the petitioner's version of events and the victims' statements.

Trial counsel testified that he asked the State for a plea offer between October 25, 2006, and November 3, 2006, after he had received H.R.'s medical report. Trial counsel recalled speaking with the petitioner about the medical report and the doctor's statement being inconclusive on November 3. The petitioner pled guilty on November 6, but on November 15, counsel received a letter from the petitioner requesting to withdraw his plea. Trial counsel advised the petitioner that his right to withdraw his plea depended on "whether or not [he had] made a knowing and voluntary plea." Trial counsel stated that he was familiar with Tennessee Rule of Criminal Procedure Rule 32(f), which states that a trial court may grant a defendant's motion to withdraw a guilty plea for any fair and just reason. Trial counsel stated that he discussed with the petitioner whether he should withdraw his plea, and the petitioner decided to go forward with his guilty plea.

Trial counsel said that he discussed the charges and their elements with the petitioner. He also discussed the definitions contained in the charges with the petitioner. He said that there was an issue with the count that alleged the petitioner had raped his sister-in-law because of the definition of coercion. Trial counsel could not recall the specific definition of coercion that he gave the petitioner as it applied to H.R.'s case. Trial counsel did not remember speaking with the petitioner about filing a motion for a speedy trial.

On cross-examination, trial counsel testified that when he began representing the petitioner, the petitioner faced two trials if he did not plead guilty. He said that he was prepared to go to trial and represent the petitioner had the petitioner chosen to go to trial. He told the petitioner that he faced eight to twelve years at 100 percent if the jury convicted him. Trial counsel's goal was to get the petitioner's sentences to run concurrently with each other. However, he explained to the petitioner that it was possible that the petitioner might have to serve them consecutively at 100 percent. He further advised the petitioner that the court could use his prior conviction in determining whether to order him to serve his sentences concurrently or consecutively.

According to trial counsel, while they were discussing the cases, the petitioner admitted penetrating his sister-in-law without her consent. He said that he advised the petitioner that if the case went to trial that he could not allow him to deny that he penetrated his sister-in-law when he testified. The petitioner told trial counsel that his wife did not know that he was having an affair with her sister. The petitioner's sister-in-law had previously consented to sexual contact with the petitioner while under the influence of drugs. Trial counsel said that the petitioner never admitted having raped H.R.

The State gave trial counsel notice of prior convictions, and trial counsel was aware that the petitioner had pleaded guilty to a charge and been incarcerated in the past. He told the petitioner that if he testified during trial, the prosecution could impeach him with evidence of the prior conviction.

Trial counsel testified that, during his investigation of the case, the State allowed him to see statements that were not a part of discovery. Trial counsel was aware that H.R. stated that she had watched pornographic videos and described certain scenes in them. He agreed that the State could use the videotapes to corroborate what H.R. described. Trial counsel recalled that one of the videotape's labeling referenced incest. Trial counsel told the petitioner that he had viewed part of the tape that corroborated H.R.'s statement and that he should consider the introduction of the videotape as evidence when deciding whether to plead guilty.

Before trial counsel began representing the petitioner, the petitioner requested his public defender to file a motion to reduce bond. Trial counsel reviewed the file and was aware that, after hearing the motion to reduce bond, the trial court increased the petitioner's bond. During the bond hearing, the State introduced letters that the petitioner had written to H.R. and her mother. Trial counsel reviewed the letters and discussed them with the petitioner. He advised the petitioner that the letters created "a very strong inference that there was some type of physical relationship going on between him and [H.R.]" He told the petitioner that he thought the letters would negatively affect his defense. He said that after some discussion, the petitioner agreed with him and accepted the plea offer. Trial counsel was aware that during the bond hearing the petitioner admitted that he had written a letter purporting to be his brother. Trial counsel told the petitioner that if the letter was brought out during trial, it might affect his credibility with the jury.

Trial counsel said he reviewed the entire plea form with the petitioner line by line. The petitioner never indicated that he did not understand anything that the plea form contained. Trial counsel testified that the petitioner also never indicated that he did not understand his charges or how the criminal justice system worked. Trial counsel said that the petitioner was very intelligent and articulate. The State offered the petitioner to plead guilty in exchange for an effective ten-year sentence at thirty-five percent, and trial counsel explained this offer to the petitioner. Trial counsel said that he discussed the benefits of taking a plea agreement with the petitioner. He said that the petitioner told him that "he didn't want to take that plea because he would not risk a consecutive sentencing and a conviction on the rape case of [his sister-in-law]."

Trial counsel was present with the petitioner when he entered the plea and said that the petitioner was not mentally impaired or under the influence of drugs or alcohol when he entered his plea. He stated that the trial judge explained the elements of the offenses and the effective sentence to the petitioner. The petitioner never told the court that he did not want to enter the plea agreement. The State gave a stipulation of facts and the petitioner accepted that the State would have the proof to which the State stipulated.

Trial counsel reviewed the results of H.R.'s medical examination and said that he did not find that the report was exculpatory for the petitioner's case. He recalled that the stipulation of facts stated that H.R. did not undergo a complete examination. Trial counsel had repeated conversations with the petitioner about the report and told him that it would not assist in getting him an acquittal.

Trial counsel stated that in the petitioner's expressing his desire to withdraw his guilty plea, the petitioner talked about being anxious and regretful about his plea, but he never stated that his guilty plea was unknowing. In his letter, the petitioner stated that he

understood the consequences of his plea. Further, the petitioner attached a chart to his letter listing his release eligibility for the crimes. Trial counsel testified that the petitioner's focus was on his case involving H.R., and the petitioner never asked to set aside his plea in the case involving his sister-in-law. Trial counsel explained to him that the guilty pleas were "a package deal," and he could not set aside one without setting aside the other. Trial counsel did not think that the petitioner had a legal basis for setting aside his guilty pleas; however, he stated that he would have filed a motion to set the guilty pleas aside had the petitioner asked him to do so. He said that the petitioner stated that he no longer wished to set aside his pleas when he appeared in court for his sentencing hearing on November 17, 2006. Instead, the petitioner told trial counsel that he wanted to waive the hearing and "do his time" so that he could begin earning sentencing credits.

Trial counsel opined that the jury would likely have convicted the petitioner in the case involving the petitioner's sister-in-law, had it gone to trial. Trial counsel was prepared to go to trial and hire an investigator if the petitioner did not plead guilty. Trial counsel did his own investigative work. He did not interview the victims; however, he had read their statements. Trial counsel also read letters that H.R. and the petitioner's other daughter wrote to the petitioner. Trial counsel stated that he discussed with the petitioner how these letters, if admitted during trial, would affect the petitioner's case.

On redirect examination, trial counsel testified that the petitioner told him that he knew his sister-in-law was unconscious when he digitally penetrated her. The petitioner told trial counsel that his sister-in-law had consented in the past and he did not think that she would have had a problem with him doing it again. Trial counsel stated that he did not find any evidence of the petitioner and his sister-in-law having a consensual relationship in the past and that the petitioner's sister-in-law would not agree to having such a relationship with the petitioner.

Trial counsel stated that he did not rely on the State's evidence alone when deciding whether to try a case. He stated that he wanted to hire an investigator for the petitioner's case to interview the victims and other witnesses to uncover any contradictions in their statements. He did not recall telling the petitioner that a speedy trial would not be applicable in his case because the petitioner had dismissed his prior counsel. However, he recalled telling the petitioner that his trials were set within six months and that a motion for a speedy trial would not get him a faster trial. He further stated that he did not think that there had been any prejudice to justify granting a motion for speedy trial.

Trial counsel said that the petitioner's letter asking to withdraw his guilty plea did not specifically exclude the case involving the petitioner's sister-in-law; however, trial counsel inferred that he was only concerned about the case involving H.R. because he primarily

referred to that case and the medical report in the letter. Trial counsel agreed that H.R.'s medical report was a big issue to the petitioner and addressing it would be irrelevant in the case involving his sister-in-law.

The petitioner testified that he had been in jail for eight months before he received a letter from the public defender's office telling him whom they had assigned to his case. He stated that during the eight months before the public defender's office assigned specific counsel to him, he had written letters to and called the public defender's office. The petitioner also wrote letters to the trial court complaining that he did not have a specific public defender assigned to his case. In his letters, the petitioner also questioned why it was taking the grand jury so long to indict him. He said that he did not receive replies to the letters that he sent. The petitioner testified there were nineteen grand jury meetings between his preliminary hearing in case number S51,181 and his indictment. There were twenty-eight grand jury meetings between his preliminary hearing in case number 51,180 and the presentment. The petitioner felt that not having an attorney until the grand jury indicted him disadvantaged him.

In April 2006, the public defender's office assigned a specific public defender to handle the petitioner's case. He said that the only time that he met with his public defender was when he went to court. The petitioner asked his public defender about filing a motion to dismiss, and she told him that she would talk to him about it but never did.

The petitioner stated that someone filed a motion for bond reduction on his behalf, and his public defender represented him at the hearing. She told him that the State had filed a counter motion to increase or deny bond because he had written letters to family members with whom he was not supposed to have contact. After learning of the State's motion, the petitioner told his public defender that he did not want to testify and that he wanted to withdraw his motion. The petitioner said that despite wanting to withdraw his motion, "somehow or another [he] was brought in [the courtroom] and ended up on the witness stand." He said that as a result of the hearing, the court increased his bond to $500,000.

The petitioner testified that neither a motion for a speedy trial nor a motion to dismiss for failure to prosecute was filed on his behalf, so he went to the law library in the prison and drafted a *pro se* motion to dismiss, which he filed on July 20, 2006. He said that the trial judge would not hear his *pro se* motion because he was represented by counsel when he filed the motion. The petitioner told the trial judge that he was unhappy with his public defender. According to the petitioner, the trial judge "got mad at [him] and asked [him] why [he] was filing complaints . . . and asked [him] how [his] lawyer was supposed to represent [him] if [he] called her a liar and accused her of ethical violations[.]"

The petitioner stated that he first met with trial counsel in the courtroom on August 17, 2006. The petitioner showed trial counsel the *pro se* motion to dismiss that he had prepared. He said that trial counsel looked at the motion and told him, "This ain't going nowhere." Trial counsel also told him that by firing the public defender and having the court appoint a new attorney, the time for determining a speedy trial restarted. The petitioner stated that he later learned that his right to a speedy trial began at his arrest.

The petitioner testified that trial counsel's performance was an improvement from the public defender's. He said that trial counsel went to court, answered his calls, and discussed his case with him. The petitioner said that he initially refused to take a plea agreement but said that he accepted the plea agreement because trial counsel told him that he could not make an adequate investigation because so much time had elapsed since the petitioner's arrest. He said that trial counsel told him that he would have handled the case differently had the court initially assigned him to the petitioner's case. The petitioner also stated that trial counsel told him that if H.R. testified that the petitioner had abused her, the jury was going to convict him.

After the petitioner decided to take the plea, he spoke with trial counsel about hiring an investigator. He said that trial counsel advised him that it would be better if his family paid for the investigator and told the petitioner how much an investigator would cost. The petitioner said that his family was remodeling their home and could not afford to hire an investigator. The petitioner asked trial counsel about filing a motion for an investigator. He testified that trial counsel had received a call from the prosecutor, and the prosecutor told trial counsel to hold off on filing a motion for an investigator because the State had a plea offer that the petitioner could not refuse. Trial counsel visited the petitioner in jail and presented the State's offer. When he agreed to plead guilty, the petitioner did not have the report from H.R.'s medical examination and was thinking about what trial counsel had told him about the jury convicting him if H.R. testified. The petitioner said that he wanted to enter an Alford plea because he was not going to admit to doing anything that he did not do.

The petitioner testified that on the date of the plea hearing, trial counsel met with him in the court's holding cell. He said that trial counsel asked him questions about his anatomy and the victim's weight. The petitioner asked trial counsel why he was asking such questions, and trial counsel told him that he had a medical report from H.R.'s examination that did not "'quite jive out with the allegations.'" The petitioner asked whether the medical report would help him in trial, and trial counsel responded that he did not think it would help. The petitioner went forward with his guilty plea.

Although he could not recall how he received it, the petitioner said that he reviewed H.R.'s medical report. The petitioner said that, after reviewing the report, he discovered that

-12-

it was inconsistent with H.R.'s allegations and thought that the report was exculpatory. He said that he wrote trial counsel a letter asking to withdraw his guilty plea. Trial counsel visited him in jail and told him that it was too late to withdraw his guilty plea. The petitioner told trial counsel that he did not want to stay in jail and wait for his sentencing hearing; he just wanted "to go to the penitentiary and start doing [his] time and get this over with."

The petitioner stated that, to him, the medical report was conclusive because it stated that H.R.'s hymen could be seen to be intact. The petitioner felt that the report and witnesses' testimony would have exonerated him. He said that he would not have pleaded guilty if he had known what the medical report contained. The petitioner stated that he was most concerned with his case involving H.R. He said that had it not been for the charges in that case, he would not have agreed to plead guilty.

The petitioner denied telling trial counsel that he committed a sexual act with his sister-in-law on the night in question. He testified that he told trial counsel that he had a prior consensual sexual relationship with his sister-in-law. He said that they had been drinking, using cocaine, and partying the day in question and that what happened that night was consensual and his sister-in-law was awake the entire time. On cross-examination, the petitioner admitted that he pled guilty to possession of a Schedule I controlled substance in 1990.

The petitioner acknowledged that the trial judge went over his rights during the plea hearing. The trial judge told the petitioner that he had the right to a jury trial, and the petitioner knew that the court had set dates for his trial. The trial judge also told the petitioner that it was his decision whether to go to trial. The petitioner admitted telling the court he wanted to plead guilty and that he decided to plead guilty on his own.

The petitioner recalled that the State's stipulation of fact detailed the evidence they intended to present at trial, including H.R.'s medical report. The petitioner agreed that he did not complain about trial counsel's representation at the plea hearing or tell the court that his attorney did not investigate the case fully. He further agreed that when he was before the court for sentencing, he did not tell the court that he wanted to withdraw his guilty plea and instead told the court that he wanted to waive sentencing.

Likewise, the petitioner agreed that his public defender advised him that the letters he had written to H.R. and her mother would be admitted during the bond reduction hearing. He said that he testified at his bond hearing because he was inexperienced with the legal system and did not know that he should have said he did not want to go forward with his motion. He said that he did not think the public defender had enough time to prepare the case. He said that the public defender told him, "Oh, well, let's just go in there, it will be all

right."

On redirect examination, the petitioner testified that he felt alienated and cut off when no one responded to his letters and phone calls. He said that he could not afford to hire private counsel and that although the trial court appointed the public defender's office to his case, "the right to counsel can't be satisfied by mere appointment." The petitioner asserted that there had to be "meaningful advisory defenses" and there were none in his case. The petitioner stated that his public defender's representation was a large factor in why he decided to plead guilty, and when the court appointed trial counsel to represent him, his case was a "mess." He thought that his public defender had too many cases and could not spend any time on his case.

Upon questioning from the court, the petitioner agreed that during his plea colloquy he answered "absolutely" when the trial judge asked him if was satisfied with trial counsel's representation. The petitioner said that, in hindsight, he knew that trial counsel should have filed his motion for a speedy trial and motion to dismiss for failure to prosecute. He stated that he was "more legally in tune" than he was then and felt that trial counsel should have understood that he did not have time to adequately consider the medical report. The petitioner said that he did not tell the court that he wanted to withdraw his plea at the time he waived sentencing because he was "beat to death mentally."

After hearing the evidence, the post-conviction court denied relief. The post-conviction court found that: (1) the petitioner failed to carry his burden of proving that trial counsel was ineffective, that trial counsel's performance was deficient, or that he would have proceeded to trial but for trial counsel's performance; (2) the petitioner entered his guilty plea voluntarily, understandingly, and knowingly; (3) the petitioner failed to prove a speedy trial violation; and (4) the petitioner failed to prove prosecutorial misconduct. Thereafter, the petitioner filed a timely appeal to this court.

## ANALYSIS

### I. Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to

the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

## II. The Petitioner's Claims Before this Court

On appeal, the petitioner argues that (1) he was constructively denied counsel at a critical stage of the proceedings against him; (2) he received the ineffective assistance of counsel, which caused him to enter unknowing and involuntary pleas; (3) the State engaged in prosecutorial misconduct; (4) the post-conviction court denied him a full and fair hearing; and (5) the trial court denied him a speedy trial.

## A. Denial of Counsel

The petitioner argues that the court's "appointment of the 'district public defender' to represent him at the preliminary hearing, at the last minute and without any preparation at all, amounted to a 'mere formality', and was totally insufficient to satisfy his right to counsel as guaranteed by the state and federal constitutions." He asserts that this appointment constituted the constructive complete denial of counsel at a critical stage in the proceeding sufficient to justify a presumption of prejudice under the standard announced in United States v. Cronic, 466 U.S. 648 (1984), without the necessity of conducting an inquiry into counsel's actual performance or the effect it had on the trial.

In Cronic, the United States Supreme Court identified three scenarios involving the right to counsel where the circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Id. at 658 (footnote omitted). In these circumstances, a presumption of prejudice is justified without the necessity of inquiring into counsel's actual performance at trial. Id. at 662. These scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceeding; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60.

The petitioner claims that the last minute appointment of the district public defender together with the public defender advising him to waive the preliminary hearing amounts to the complete denial of counsel under Cronic. He asserts that he was unable to assert his right to a speedy trial, file any motions, or conduct a pretrial investigation because he did not have

-15-

counsel to help during the "critical pretrial stage of the prosecution." The record indicated that the general sessions court appointed the district public defender's office to represent the petitioner in that court. By the petitioner's own testimony, a public defender was present for his September 6, 2005 preliminary hearing and advised the petitioner to waive the hearing. On October 28, 2005, the criminal court appointed the district public defender's office to represent the petitioner in that court. The district public defender filed a motion to reduce bond on November 17, 2005, and a public defender represented the petitioner at the bond reduction hearing. An attorney from the public defender's office appeared on the petitioner's behalf on at least ten other court dates. On July 25, 2006, the criminal court relieved the public defender's office of its representation and appointed private counsel to represent the petitioner.

The petitioner appears to take issue with the district public defender office's policy of not allocating an exclusive public defender to a defendant until after indictment. The United States Supreme Court in Chambers v. Maroney, 399 U.S. 42 (1970), refused "to fashion a per se rule requiring reversal of every conviction following tardy appointment of counsel." Id. at 53-54. Thus, a Sixth Amendment claim is sufficient without inquiry into counsel's actual performance at trial only when surrounding circumstances justify a presumption of ineffectiveness. There is no such justification in this case. The petitioner had the advice of counsel at all critical stages in his proceeding. The court appointed the public defender's office to represent the petitioner shortly after his arrest. Although the public defender's office had not yet assigned an exclusive attorney to represent him, an attorney from the office was present at the preliminary hearing and gave the petitioner legal advice, which the petitioner accepted. Moreover, an attorney from that office filed a motion to reduce the petitioner's bond and appeared at the bond hearing to represent the petitioner, as well as at other court date appearances. Accordingly, we cannot agree with the petitioner's assertion that he was denied counsel and that the facts of his case warrant analysis under the Cronic standard. The petitioner is not entitled to relief on this issue.

## B. Ineffective Assistance of Counsel

Next, the petitioner asserts that trial counsel's failure to investigate or otherwise prepare for trial resulted in actual, demonstrable prejudice under the more familiar Strickland standard. Specifically, he contends that trial counsel was deficient for failing to investigate further into the results of H.R.'s medical examination, investigate applicable law regarding the State's using his prior conviction for impeachment, discover prosecutorial misconduct, file a speedy trial motion, explain the elements of the charges, and move to withdraw the petitioner's guilty plea. He further contends that trial counsel's alleged deficiencies prejudiced him. We respectfully disagree.

-16-

To determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. The Strickland court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances . . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

The post-conviction court accredited the testimony that trial counsel was an experienced attorney who met with the petitioner at jail, communicated with the petitioner on the telephone and through letters, filed for and obtained discovery, met with the State, and reviewed witnesses' statements. In addition, trial counsel prepared a motion to hire an investigator but did not go forward with it at the petitioner's request. Trial counsel went over the offenses, the possible sentences, and the specifics of the plea agreement with the petitioner. Trial counsel showed the petitioner the report from H.R.'s medical examination. Trial counsel said that, in his professional opinion, the report was inconclusive and would not help the petitioner's case. Trial counsel discussed the speedy trial motion with the petitioner and stated that because the trials were set within six months, the motion would not be beneficial. Trial counsel stated that after he received the petitioner's letter stating that he wanted to withdraw his guilty plea, he discussed with the petitioner whether he should withdraw his plea, and the petitioner decided to not withdraw his guilty plea and to waive his sentencing hearing. The record fully supports the findings and conclusions of the post-conviction court. The petitioner has not shown that trial counsel's performance was deficient and is not entitled to relief on this issue.

In an interrelated argument, the petitioner argues that counsel's alleged deficiencies in seeking H.R.'s medical report resulted in his entry of an involuntary and unknowing guilty plea. When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S .W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

The record shows that the petitioner, who represented himself on appeal, could communicate his ideas well, both verbally and in writing. The petitioner had pled guilty to offenses in the past, and he was familiar with criminal proceedings. The transcript of the guilty plea hearing reveals that the trial court appropriately informed the petitioner of his constitutional rights and the specific rights he was waiving by pleading guilty. The petitioner assured the trial court that his counsel had discussed the plea agreement with him, that he fully understood its terms and the constitutional rights he was waiving by entering his plea, and that he was freely and voluntarily entering the plea because he believed it was in his best interest to do so. A petitioner's testimony at a guilty plea hearing "constitute[s] a formidable barrier" in any subsequent collateral proceeding because "[s]olemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). The trial court accredited the petitioner's guilty plea hearing testimony over his post-conviction testimony. Nothing in the record dispels the reliability of the petitioner's guilty plea testimony. The petitioner has failed to prove by clear and convincing evidence that his guilty pleas were involuntary. We conclude, therefore, that the record shows that the petitioner's

guilty plea was knowingly, intelligently, and voluntarily entered.

## C. Prosecutorial Misconduct

The petitioner further asserts that the State engaged in prosecutorial misconduct. Specifically, the petitioner asserts that the State intentionally failed to obtain material evidence, intentionally delayed presenting his case to the grand jury, and deceived the grand jury.

The petitioner argues that the State intentionally failed to obtain and disclose the results of H.R.'s medical examination. He further posits that, but for the belated disclosure of the report, he would not have pleaded guilty and would have insisted on going to trial. In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the prosecution has a duty to furnish to the defendant exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. The Court explained that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

The post-conviction court found:

> While the record reflects that there was a delay in the medical report being made available to the District Attorney, the petitioner has not shown that [the] report was in the possession of the State, that the delay was purposeful or otherwise done to prevent the petitioner from having adequate time to consider the report prior to a trial or plea.

The post-conviction court accredited Detective Russell's testimony that he was unaware of the report until the district attorney's office notified him that H.R.'s private physician had performed an examination. When the State became aware of the examination, it obtained a copy of the results and forwarded them to trial counsel who discussed it with the petitioner. The petitioner was aware of the report and its contents before he entered his guilty plea.

-20-

Trial counsel opined that, based on his experience, the report was inconclusive. Thus, the petitioner has failed to show that the State suppressed the information, the information was favorable to his defense, and the information was material.

The petitioner claims that the prosecution intentionally delayed presenting its case to the grand jury. As this court explained in State v. Dunning, 762 S.W.2d 142, 144 (Tenn. Crim. App. 1988): "In order to achieve dismissal based upon . . . a delay [between the offense and the indictment], the defendant must show that (1) the delay caused substantial prejudice to his rights to a fair trial; and (2) the delay was an intentional device to gain tactical advantage over the accused."

In the case *sub judice*, obviously a delay occurred. There was an approximate seven-month delay between the petitioner's arrest and indictment in one case and an eleven-month delay between arrest and indictment in the other. The post-conviction court found that the delay was not so extensive as to deprive the petitioner of his due process rights. Detective Russell explained that the delay was due to the investigation of the allegations and ensuring that the offenses occurred in Sullivan County. A review of the record reveals nothing to alter this conclusion. Additionally, no evidence exists that the State caused the delay to obtain a tactical advantage. Thus, the petitioner was not deprived of due process as a result of the delay.

Finally, the petitioner argues that the prosecution engaged in misconduct when it used unnecessary and improper hearsay testimony to obtain the counts in case number S51,180 that involved acts occurring between August 1, 2005 and August 29, 2005. The petitioner claims that there was no evidence that offenses occurred between those dates.

Detective Russell was the only person to testify at the grand jury hearing. The post-conviction court accredited Detective Russell's testimony that he did not specifically recall testifying about incidents occurring in August 2005, but he could not say that he did not testify to such incidents. While the affidavit filed in general sessions court did not refer to any offenses in August, there was additional investigation, including an interview of the victim, before the State presented the case to the grand jury. Moreover, the facts recited by the State at the guilty plea hearing reflect that there was evidence that the sexual encounters continued until August 29, 2005, and the petitioner acknowledged that the State would have that evidence if there were a trial. The petitioner has failed to show that the prosecutors engaged in deception or that there was no evidence that some offenses occurred in August 2005. Thus, he is not entitled to relief on this issue.

## D. Post-Conviction Hearing

The petitioner argues that he was denied compulsory process in the post-conviction court when the post-conviction court refused to allow his public defender, H.R., or the district attorney to testify at his evidentiary hearing. The petitioner claims that his public defender's testimony was necessary to show that he was denied counsel during the pretrial stage and that H.R. and the district attorney's testimony were necessary to show prosecutorial misconduct. We disagree.

Although an accused in a criminal trial has a constitutional right to the compulsory attendance of witnesses under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Constitution of Tennessee, a petitioner's right to compulsory process for obtaining witnesses in his or her favor is not absolute. State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982).

> "A court is not required to issue compulsory process for anyone whom accused may designate as a witness; the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Within these limitations accused may obtain the attendance of any witnesses he cares to use."

Bacon v. State, 385 S.W.2d 107, 109 (Tenn. 1964) (quoting 97 C.J.S. Witnesses, § 9).

The petitioner has failed to demonstrate that any of these witnesses would have offered any additional material evidence. The post-conviction court found that the public defender's testimony was irrelevant to whether the petitioner had effective assistance for the purpose of his plea because she did not represent him during his plea. Likewise, the court found that H.R. and the district attorney were not relevant witnesses to the post-conviction hearing, as their potential testimonies had no bearing on the voluntarily and intelligent nature of the petitioner's guilty pleas. Under these circumstances, we conclude that the post-conviction court did not abuse its discretion in not allowing the witnesses to testify.

## E. Speedy Trial

The petitioner alleges that he was denied the right to a speedy trial. The Sixth Amendment to the United States Constitution and article 1, section 9 of the Tennessee Constitution guarantee the accused the right to a speedy and public trial. In determining whether the petitioner's right to a speedy trial was violated by the delay in this case, we must consider the following four factors: (1) the length of the delay; (2) the reason for the delay;

(3) the petitioner's assertion of the right; and (4) the prejudice caused to the petitioner by the delay. <u>See</u> <u>State v. Bishop</u>, 493 S.W.2d 81, 83-84 (Tenn. 1973) (citing <u>Barker v. Wingo</u>, 407 U.S. 514 (1972)). The second factor "generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." <u>State v. Wood</u>, 924 S.W.2d 342, 346-47 (Tenn. 1996) (footnotes omitted).

The post-conviction court found that the seven-month and eleven-month delays between the petitioner's arrest and his indictment were not extensive enough to deny him due process. The court further found that the delays were due to investigations to determine the jurisdiction of the offenses. The petitioner has not shown that the State delayed his indictment or trial date for a tactical advantage or to prejudice the petitioner. The petitioner asserted his right to a speedy trial via a *pro se* motion filed in July 2006. At that time, the public defender's office represented the petitioner and the trial court did not hear the motion. Instead of hearing the motion, the trial court appointed trial counsel, who set the cases for trial within six months. Trial counsel testified that the petitioner did not suffer any prejudice due to the delay. Accordingly, we conclude that the record supports the trial court's determination that the petitioner was not denied his right to a speedy trial.

## **CONCLUSION**

Based on our review, we conclude that the petitioner has not met his burden of showing that trial counsel was ineffective or that his guilty pleas were unknowing and involuntary. Accordingly, we affirm the dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-23-